*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS BYRNE,

        Plaintiff/Counterdefendant-
Appellant/Cross-Appellee,

v

RODNEY GRANDFIELD and MARILYN INNES,

        Defendants/Counterplaintiffs-
Appellees/Cross-Appellants.

UNPUBLISHED
June 9, 2022

No. 356462
Kent Circuit Court
LC No. 19-009870-CH

Before: BORRELLO, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

In this dispute over the existence and proper scope of an easement, plaintiff, Thomas Byrne, appeals by right the trial court's order limiting his use of the easement. On cross-appeal, defendants, Rodney Grandfield and Marilyn Innes, appeal by right the trial court's earlier order determining that the easement at issue was appurtenant rather than an easement in gross. For the reasons explained in this opinion, we affirm the trial court's order of July 21, 2020, in which the trial court determined that the easement was appurtenant. However, because we conclude that the trial court erred when it determined that Byrne could not use the easement for limited temporary parking or to erect a dock as a matter of law, we affirm in part, reverse in part, and vacate in part the trial court's order of February 11, 2021. We remand this case to the trial court to amend the order to conform to this Court's opinion.

## I. BASIC FACTS

Byrne testified that the entire area at issue was once owned by a farmer named Thomas Lyons. Byrne stated that Lyons eventually sold the part of his land along Murray Lake to David and Betty King. The Kings, as vendees along with Thomas and Sada Lyons as the landowners, developed much of the land into two subdivisions: Bedaki Shores No. 1 and Bedaki Shores No. 2. The developments centered on Bedaki Avenue, which runs generally south from 5 Mile Road along the eastern side of Murray Lake in Grattan Township, Kent County, Michigan.

At the southeast end of Bedaki Avenue, which ended at the border of Bedaki Shores No 2., the Kings owned land that was not part of a platted development. The Kings eventually divided the land and sold it as individual lots. The land now consists of five lots with homes at the southeast end of Bedaki Avenue: 3999 Bedaki Avenue, 3988 Bedaki Avenue, 3986 Bedaki Avenue, 3985 Bedaki Avenue, and 3980 Bedaki Avenue. The remainder of the land formerly owned by the Kings is still undeveloped; it lies to the northeast of the southeastern end of Bedaki Avenue. That parcel is known as Parcel C.

The Kings sold the lots known as 3980, 3985, 3986, and 3988 Bedaki Avenue between 1965 and 1967. None of the deeds involving those transfers included a roadway easement across 3999 Bedaki Avenue to Murray Lake. The Kings sold the lot now known as 3999 Bedaki Avenue to Alfred and Mildred Hackstedt in August 1972. The northwest border of 3999 Bedaki Avenue abutted Lot 58 of Bedaki Shores No. 2. 3999 Bedaki Avenue was just off the southeastern end of Bedaki Avenue, and had about 80 feet of frontage on Murray Lake. The Kings transferred the property to the Hackstedts subject to two easements, which were both described as for roadway purposes. One roadway easement ran along the northeastern edge of the property, which provided access to Bedaki Avenue for the three lots to the east and southeast of 3999 Bedaki Avenue. The Kings also reserved a 30-foot-wide roadway easement along the northwest border of the lot. That roadway easement extended from the southeast end of Bedaki Avenue to Murray Lake. The warranty deed from the Kings to the Hackstedts did not identify the property benefited by the roadway easement to Murray Lake.

In 1983, the Kings sold three parcels—identified as Parcels A, B, and C—to Melvin and Patricia Bulk. The Kings identified the parcels as abutting Bedaki Shores No. 2 to the northeast. The parcels spanned from 5 Mile Road southeast to the end of Bedaki Avenue. In the deed, the Kings reserved a roadway easement across Lot 64 of Bedaki Shores No. 2 for the benefit of Parcel B. They reserved a roadway easement across Parcel C for the benefit of Parcel A, and they reserved a roadway easement across Lot 59 of Bedaki Shores No. 2 to Bedaki Avenue for the benefit of Parcel C. In the deed to the Bulks, the Kings also identified Parcel C as the land benefited by the roadway easement that crossed the northwest portion of 3999 Bedaki Avenue from the end of Bedaki Avenue to Murray Lake. This was the first mention of the land benefited by the roadway easement across the northwest portion of 3999 Bedaki Avenue in a warranty deed. However, the Kings noted that they were transferring the warranty deed to the Bulks in fulfillment of a land contract covering the properties, which the parties had previously executed on October 14, 1963. The Bulks then sold the parcels to the Dan Byrne Oil Co, which transferred them to Byrne.

Byrne stated that he purchased the land northeast of the Bedaki Shores development in 1984. He purchased the land to develop it. Byrne owned Parcel C and all the properties to the north of Parcel C, which extended up to 5 Mile Road. Byrne averred that an important part of his decision to purchase Parcel C was the fact that it included the Lake Easement. He stated that he intended to use the Lake Easement to benefit the development of his other parcels. After Byrne purchased the land, he made a point of walking the land and Lake Easement at least once a year to check on it.

Eventually, Frank and Cheryl Rusch purchased 3999 Bedaki Avenue, and the Ruschs sold the property to Grandfield and Innes in January 2015. Byrne spoke to Grandfield after Grandfield

and Innes purchased the property. He did so after he observed that they had planted trees and erected playground equipment within the easement. He felt that the trees and playground equipment blocked the Lake Easement. Byrne said that Grandfield informed him that he had checked on the scope of the easement and believed that Byrne only had the right to walk along the easement—he told Byrne that he could not drive on it, park on it, or do anything else with it. As a result of that encounter, Byrne drafted a letter and sent it by certified mail to Grandfield. Grandfield apparently refused to sign it, and the mail carrier returned it to Byrne. Byrne tried to speak with Grandfield again at Grandfield's home, but Grandfield closed the door in his face.

Byrne sued Grandfield and Innes in November 2019. He alleged claims of trespass, nuisance, and asked for a declaratory judgment and injunctive relief. Grandfield and Innes responded in December 2019, and alleged counterclaims. They alleged that the Kings did not create a valid easement, which should be extinguished, and, to the extent that the court might determine that the easement was valid, they asked the trial court to declare the scope of the easement.

In May 2020, Grandfield and Innes moved for summary disposition. They argued that the undisputed evidence showed that the Kings reserved an easement over 3999 Bedaki Avenue in 1971, but did not identify a dominant estate by deed until the transfer of Parcel C to the Bulks in 1983. Because there was no dominant estate when the easement was created, they argued that the easement was an easement in gross that could not be transferred and was invalid as a matter of law. In the alternative, they asked the court to interpret the scope of the easement to be limited: they asked the court to declare that Byrne could not install a dock or shore station on it, could not moor a boat or store items on the easement, and could not lounge or picnic on the easement. They also argued that they had the right to use the easement in any way that was not inconsistent with Byrne's limited rights. As such, they could plant trees and erect playground structures on the easement. Finally, they argued that Byrne could not show that he had suffered any damages as a result of the use of the easement by Grandfield and Innes.

Byrne responded to the motion for summary disposition by moving for summary disposition in his favor. He argued that the undisputed evidence showed that the Lake Easement benefited Parcel C and was appurtenant to Parcel C. He stated that such easements are not limited to those that are necessary to access a property. Byrne also argued that a 30-foot-wide easement for a roadway necessarily encompasses vehicular travel and the right to erect a dock at the end because that is the only logical reason for such an easement. Byrne stated that there was, at the very least, a factual dispute about the scope of the easement and whether the obstructions in the easement violated his right to use it.

The trial court held a hearing on the motions in June 2020. The trial court determined that the undisputed evidence showed that the Lake Easement was a valid easement appurtenant to Parcel C. It declined, however, to decide the proper scope of the easement and whether any defenses applied. It left those matters for further discovery. On July 21, 2020, the trial court entered an order granting Byrne's motion for summary disposition under MCR 2.116(I)(2) on the issue whether the easement was in gross or appurtenant. In all other respects, it denied the parties' motions without prejudice.

Byrne filed a second motion for summary disposition in October 2020. He argued that the undisputed evidence showed that Grandfield and Innes had no defenses to the existence of his easement. More specifically, he argued that there was no evidence that it was abandoned, no evidence to support the contention that it was adversely possessed, no evidence that a statute of limitations applied, and no evidence that he lacked standing to assert his claims. He also argued that the scope of the easement included the right to pave the easement for vehicular traffic and install a removable dock as a matter of law.

The trial court held a hearing on the motion later that same month. On February 11, 2021, the trial court entered an order resolving the disputes. The court first determined that there was no evidence to support either the defense of abandonment or adverse possession. The court then examined the scope of the easement. Although the easement was for a 30-foot-wide roadway, the court determined that that did not allow a "paved roadway" because that would not be "minimally burdensome" to Grandfield and Innes. The court also determined that the easement could not be used for a "dock, boat ramp, overnight storage of items or long-term parking." Although Grandfield and Innes asked the court to determine that the easement could only be used by a single household on Parcel C, the court declined to reach that issue because Byrne had not developed the property. For these reasons, the trial court granted Byrne's second motion for summary disposition in part and denied it in part. Byrne appealed in this Court the trial court's order limiting the scope of the easement, and Grandfield and Innes cross-appealed the trial court's earlier order declaring the easement to be appurtenant and not in gross.

## II. NATURE OF EASEMENT

### A. PRESERVATION

We first address the claim on cross-appeal by Grandfield and Innes. They maintain that the trial court erred as matter of law when it determined that the easement was appurtenant to Parcel C and not an easement in gross.

To preserve a claim of error for appellate review, the issue must have been raised in the trial court. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). The parties addressed whether the easement was an easement in gross or an easement appurtenant in competing motions for summary disposition. Therefore, that issue was properly preserved for appellate review. See *id*.

The trial court also mentioned the fact that the Kings put the reservation of the Lake Easement in the deed that they conveyed to Grandfield and Inness' predecessors in interest. It mentioned that fact in its discussion of the evidence tending to show that the reservation was an easement appurtenant, rather than an easement in gross. It did not, however, address whether Grandfield and Innes purchased 3999 Bedaki Avenue free from the Lake Easement because they were good-faith purchasers who did not have adequate notice of the easement. As Byrne correctly notes in his brief on cross-appeal, that issue was not before the trial court. Consequently, to the extent that Grandfield and Innes have made that argument, it has not been preserved for appellate review. See *id*.

-4-

Unlike a criminal case, when a party fails to raise an issue in the trial court, the issue is waived. See *Bailey v Schaaf (On Remand)*, 304 Mich App 324, 344-345, 345 n 3; 852 NW2d 180 (2014), vacated not in relevant part 497 Mich 927 (2014). Although this Court has the discretion to review unpreserved claims of error in civil cases, see *id.*, our Supreme Court has cautioned that courts should exercise that discretion sparingly, see *Napier v Jacobs*, 429 Mich 222, 233-234; 414 NW2d 862 (1987).

The record has not been fully developed on this issue. For that reason, we would be forced to speculate about whether a reasonable purchaser of 3999 Bedaki Avenue was on notice that the Lake Easement gave rights to one or more other properties and what steps such a purchaser might make to determine whether the easement was appurtenant. Moreover, there may be other property owners who could assert the right to use the easement at issue. As such, resolution of this issue could implicate the rights of third parties. For these reasons, we decline to exercise our discretion to review this unpreserved claim of error. See *Bailey*, 304 Mich App at 344-345.

## B. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009). This Court reviews the proper interpretation of a deed in the same way as a contractual agreement, see *Wiggins v City of Burton*, 291 Mich App 532, 551; 805 NW2d 517 (2011), and this Court reviews de novo whether an agreement is ambiguous, see *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003). This Court also reviews de novo whether the trial court properly interpreted and applied Michigan's common law. *Conlin v Upton*, 313 Mich App 243, 254; 881 NW2d 511 (2015).

## C. ANALYSIS

An easement is the right to use another's land for a specified purpose. *Heydon v MediaOne*, 275 Mich App 267, 270; 739 NW2d 373 (2007). Michigan's common law recognizes two types of easements: easements in gross and easements appurtenant. *Id.* An easement in gross is the right to use land for the benefit of a particular person, whereas an easement appurtenant is a right attached to land—it is "connected with the use or enjoyment of the benefited parcel and may pass with the benefited property when the property is transferred." *Id.* By contrast, an easement in gross, except in limited cases, cannot be assigned; it expires upon the death of the person or persons to whom it was granted because it cannot be inherited. See *Stockdale v Yerden*, 220 Mich 444, 447-449; 190 NW 225 (1922). The owner of land may create an easement through an express grant, by reservation or exception, or by covenant or agreement. *Heydon*, 275 Mich App at 270.

When a grantor establishes an easement appurtenant to an estate in land, the land burdened by the easement is called the servient estate and the land benefited by the easement on the servient estate is called the dominant estate. *Schadewald v Brulé*, 225 Mich App 26, 36; 570 NW2d 788 (1997). An easement appurtenant is appurtenant to every part of the dominant estate or estates, whatever the subdivision at the time or subsequently. *Barbaresos v Casaszar*, 325 Mich 1, 8; 37 NW2d 689 (1949). An easement appurtenant attaches to land and cannot exist separate from the land to which it is annexed. *Schadewald*, 225 Mich App at 35. For that reason, if a common owner takes title to both the dominant and servient estate, the easement appurtenant is extinguished as to

the dominant estate that was joined to the servient estate; the sale of the former servient estate will not revive the easement as to the dominant estate unless the common owner again reserves the easement. See *von Meding v Strahl*, 319 Mich 598, 605-606; 30 NW2d 363 (1948).

Grandfield and Innes argued in the trial court that the Kings did not intend to create an easement appurtenant to any land when they sold 3999 Bedaki Avenue to their predecessors in interest. They maintained that the Kings actually intended to create an easement in gross for themselves which could not be assigned. It is well settled that the intent of the grantor when the easement was created governs the nature and extent of the easement. See *Wiggins*, 291 Mich App at 551.

The Kings created the easement at issue when they transferred the parcel commonly known as 3999 Bedaki Avenue to the Hackstedts in August 1972. When the Kings deeded 3999 Bedaki Avenue to the Hackstedts they wrote into the deed that they were "reserving" two easements "for roadway purposes" over the land conveyed to the Hackstedts. They reserved an approximately 30-foot-wide strip of land along the northwestern portion of 3999 Bedaki Avenue where it abutted the lot described as Lot 58 of Bedaki Shores No. 2. They formally described the area of the easement using metes and bounds, and identified it as extending to the water's edge of Murray Lake (the Lake Easement). They also reserved for roadway purposes a strip of land along the northeastern portion of 3999 Bedaki Avenue, which extended in a southeasterly direction from the end of Bedaki Avenue to the lots now known as 3985, 3986, and 3988 Bedaki Avenue. They similarly described that easement by metes and bounds. The Kings did not specifically identify any dominant estate or estates that they intended to benefit from the creation of these easements. Nevertheless, the formality and precision with which they identified the easements, and the evidence that the Kings had been developing the land for years, strongly suggested that the Kings reserved the easements to benefit certain parcels of property.

Despite the formality of the reservation, Grandfield and Innes maintained that the Kings' failure to specifically identify a dominant estate showed that they intended to reserve an easement in gross for themselves—at least for the Lake Easement—and did not intend to create an easement appurtenant to any other land. However, the failure to identify the dominant estate or estates when reserving an easement does not by itself establish an intent to create an easement in gross. Under Michigan law, "an easement will never be presumed to be a mere personal right where it can fairly be construed to be appurtenant to some other estate." *von Meding*, 319 Mich at 610. "Whether an easement is in gross or appurtenant must be determined by the fair interpretation of the grant or reservation creating the easement, aided if necessary by the situation of the property and the surrounding circumstances." *Id*.; see also *Akers v Baril*, 300 Mich 619, 624; 2 NW2d 791 (1942) ("Where an owner conveys part of his land and reserves an easement over it, without specifying that such easement is to be appurtenant to land retained by him, the surrounding circumstances, including the adjacency of the way to the land retained, may be considered by the court in order to ascertain the intention that the easement was intended to be appurtenant thereto."). In this case, the surrounding circumstances can fairly be construed to demonstrate that the Kings intended to create an easement appurtenant when they reserved the easements at issue in the deed conveying 3999 Bedaki Avenue to the Hackstedts.

The record in this case showed that the Kings owned all the properties at issue. The record does not, however, show whether they owned all the properties as a single parcel or as multiple

parcels. Nevertheless, there was no evidence in the trial court that the Kings ever resided on any portion of the property and no evidence that they utilized the property that they purchased around Murray Lake for any purpose other than to develop it for sale. Indeed, the Kings platted a large portion of their land along Murray Lake and Bedaki Avenue into two subdivisions, Bedaki Shores No. 1 and Bedaki Shores No. 2, which lots they then sold to the general public. The record showed that the Kings organized and sold the backlots in the subdivisions in such a way that the purchasers would have access to Murray Lake. That evidence demonstrated an intent to maximize the value of the individual lots by ensuring that the lots had lake access.

The record showed that the Kings also owned the properties now described as Parcels A, B, and C, and owned the lots now commonly described as 3980, 3985, 3986, 3988, and 3999 Bedaki Avenue, which were not part of any platted subdivision. The evidence showed that the Kings had entered into two land contracts with the Bulks in about 1963, and that, the land contracts apparently involved Parcel C. By 1967, the Kings had also sold all the other parcels with addresses on Bedaki Avenue except for 3999 Bedaki Avenue. Notably, the parcels now known as 3985 Bedaki Avenue, which then included 3986 Bedaki Avenue and 3999 Bedaki Avenue, appear to have been the last parcels outside the subdivisions that the Kings owned that had frontage on Murray Lake. The Kings sold the property that was later divided into 3985 and 3986 Bedaki Avenue in 1966. As a result, by 1972, the only property remaining outside the subdivision that the Kings owned that also had frontage on Murray Lake was 3999 Bedaki Avenue.

The evidence showed that—at a time when the Kings still owned Parcels A, B, and C, which was under a land contract with the Bulks—the Kings sold 3999 Bedaki Avenue, which was their last property from the formerly connected group of properties other than Parcel C. When they sold that property to the Hackstedts in 1972, the Kings specifically reserved the Lake Easement and the other easement along the northeastern edge of 3999 Bedaki Avenue. In reserving the Lake Easement, the Kings carefully ensured that the easement abutted Bedaki Avenue and described it as for roadway purposes. The Kings also made the easement about 30 feet in width for the full length of the property to Murray Lake. In fact, the Kings reserved the Lake Easement with the same dimensions that they reserved for the roadway easement at the northeast end of 3999 Bedaki Avenue, which provided vehicular access to 3985, 3986, and 3988 Bedaki Avenue. They used metes and bounds to describe the lands affected by the two easements, which—as the trial court correctly noted—suggested a level of formality that was inconsistent with the intent to reserve a mere personal right of passage. The same is true with the reservation for roadway purposes—a roadway implies a greater degree of permanence than would accompany a mere personal right that would expire upon the Kings' deaths. The totality of this evidence demonstrated that the Kings reserved the easements on 3999 Bedaki Avenue with the intent to benefit their remaining properties as part of their overall development scheme and to meet their obligations on the properties that they already sold or which were under land contract.

Grandfield and Innes also did not present any evidence demonstrating that the Kings had the intent to reserve a mere personal right with the Lake Easement. Instead, they relied on, and continue to rely on, the absence of direct evidence that the Kings intended to create an easement appurtenant. More specifically, they rely on the Kings' failure to specifically identify the dominant estate or estates, and they rely on the fact that—unlike the properties to the east of the other easement for roadway purposes—the Kings did not own land directly connected to the Lake Easement by the time that they created the Lake Easement. As our Supreme Court stated

-7-

approximately 100 years ago, when there is "nothing to show that the parties intended it to be a mere personal right, it should be held to be appurtenant and not in gross, the presumption therefore being in favor of the former where there is a doubt as to the real nature of the grant." *Smith v Dennedy*, 224 Mich 378, 382; 194 NW 998 (1923) (quotation marks and citation omitted). Consequently, it is not enough to show that there was some doubt about the nature of the grant on the face of the deed—Grandfield and Innes had to present evidence that permitted an inference that the Kings did not intend to benefit their other lands when they reserved the easement. When a reservation operates to enhance the value of the owner's other adjacent lands, there is a strong indication that the grantor intended the easement to be appurtenant to those lands. *Id*.; see also *Penrose v McCullough*, 308 Mich App 145, 148; 862 NW2d 674 (2014) (stating that, if the easement in question relates in some way to a particular parcel of property, then it will nearly always be deemed appurtenant).

There was no evidence that the Kings resided on any of the properties at issue or utilized Murray Lake for recreation in any way. By contrast, the evidence submitted with the motions for summary disposition showed that the Kings, along with the Lyons, developed all the lands around the lands at issue as investment property. The fact that they intended to profit from the sale of the lands strongly suggested that any easements that they reserved were part of their development plan. Further, the evidence that the Kings reserved two easements over 3999 Bedaki Avenue, and that one easement was clearly intended to benefit lands previously owned by the Kings, also suggested that the Kings made the reservations together as part of their development plan. Moreover, the evidence that the Kings owned Parcel C, but that it was under land contract to Byrne's predecessor in interest, permitted an inference that the Kings reserved the Lake Easement with the intent to fulfill obligations involving their remaining lands, which included Parcel C. The Kings' decision to reserve the Lake Easement as an easement appurtenant for their remaining properties was, therefore, entirely consistent with their historical development of the lands.

The evidence showed that the Bulks completed their land contract with the Kings in 1983. The Kings then granted the Bulks a warranty deed that specifically mentioned the Lake Easement that the Kings had previously reserved over 3999 Bedaki Avenue. The Kings also mentioned another easement that they had made over Lot 59 of Bedaki Shores No. 2, which made it possible for the owner of Parcel C to drive over Lot 59 to Bedaki Avenue and then proceed along Bedaki Avenue to the Lake Easement. The Kings' grant of the warranty deed to the Bulks, which identified the Lake Easement and granted that easement to the Bulks, permitted an inference that the Kings had reserved the easement over 3999 Bedaki Avenue in 1972 to benefit the properties that they still owned and which were under land contract to the Bulks.

Notwithstanding the evidence that the Kings intended to reserve the Lake Easement to benefit their other properties, Grandfield and Innes argue that the Kings' reservation cannot be appurtenant because the Kings did not own any property next to the Lake Easement. They maintain that Michigan law requires any easement for roadway purposes to abut the dominant estate or it is invalid and, because Parcel C does not "touch or even line up with the easement which connects the Byrne property to the public street," they argued that the Kings could not have reserved the Lake Easement for the benefit of Parcel C. Grandfield and Innes rely heavily on the decision in *Lathrop v Elsner*, 93 Mich 599; 53 NW 791 (1892), for that proposition.

In *Lathrop*, our Supreme Court considered whether a reservation was in gross or appurtenant. *Id.* at 600-601. The Court held that it was clearly appurtenant. *Id.* In distinguishing another case from a foreign jurisdiction that held that an easement for a right-of-way was in gross, the Court noted that that case involved a reservation where "both termini of the way were disconnected from the land retained by the grantor, and hence would not be presumed to be appurtenant to it." *Id.* at 601. In distinguishing the case, the Court did not establish a rule of law for Michigan—it merely noted the conditions surrounding the reservation in the other case and opined that those conditions were not analogous to the case before it. *Id.* Therefore, the Court's decision in *Lathrop* cannot be understood to preclude a grantor from reserving an easement appurtenant over land when the dominant estate does not border the servient estate. At best, the Supreme Court's note about the distinguishing facts suggested that the lack of connection was a factor to consider when determining whether an easement was intended to be appurtenant.

Unlike the facts involved in the case distinguished by the Court in *Lathrop*, the conditions surrounding the Kings' reservation of the Lake Easement demonstrate that the Kings intended to reserve a roadway to allow road access to Murray Lake for the properties that remained to them when they conveyed 3999 Bedaki Avenue to the Hackstedts, which at that time included Parcel C. Moreover, our Supreme Court later clarified that a "right of way may be appurtenant where the servient tenement is not adjacent to the dominant, according to the rule established in the majority of jurisdictions." *Akers*, 300 Mich at 626. And our Supreme Court followed that rule in *von Meding*.

In *von Meding*, 319 Mich at 610-611, the Supreme Court rejected the contention that the easement over the lakefront parcel, which included a long right-of-way extending to the east and south, was in gross. The Court determined that, on the basis of the circumstances surrounding the grant of the easement by the owner of the lakefront parcel to the owner of various inland parcels— without identifying the specific parcels—the grantor intended to grant the grantee an easement appurtenant to all the lands that the grantee held in the vicinity. *Id.* at 610-615. The Court reached that conclusion even though some of the parcels did not touch the right-of-way at issue, but instead had to access the right-of-way by traveling along other rights-of-way. *Id.* at 609-610 (stating that the circumstances surrounding the grant of the easement and the other transfers of property showed that the grantor intended to grant the easement to all the lands owned by the grantee). Therefore, whether a dominant estate borders the servient estate is not dispositive. Rather, the trial court had to examine the totality of the circumstances to determine whether the Kings intended to make the Lake Easement appurtenant to Parcel C.

Our Supreme Court also appears to have followed that rule in *Summers v Harbor Hills Ass'n*, 351 Mich 195; 88 NW2d 478 (1958). In that case, a married couple, the Summers, acquired approximately 180 acres of land near a lake and decided to develop the land for sale. *Id.* at 197. They had a broker develop a plat for 140 acres that included a proposed boat basin and community area on the lake that was to benefit backlot owners. *Id.* The original plat did not materialize, but the Summers eventually recorded an assessor's plat of the 140 acres with the boat basin and community areas again listed in the plat and began selling lots in the 1940s. *Id.* at 197-198. In 1954, the Summers sold a parcel of land outside the assessor's plat, but purported to grant to the new owners the right to use the boat basin and community areas within the assessor's plat. *Id.* at 199. That sale gave rise to a dispute with the owners of the lots in the plat, who claimed the

exclusive right to use the easement over the land occupied by the boat basin and community area. *Id*. at 199-200.

Our Supreme Court held that that the Summers reserved the right to use the easement when they dedicated the easements to the use of the lot owners (referring to the lots in the plat) and the proprietors, which had to refer to the Summers as the owner who created the plat. *Id*. at 201. By reserving that right, the Court held, the Summers could convey the right to use the easements for any of the parcels that they still owned, even those outside the plat. *Id*. at 201-202. Indeed, the Court cited the testimony that the Summers had in fact conveyed the right to use the boat basin when they sold the Castleman property, which was " 'far away from the Assessor's Plat of Harbor Hills.' " *Id*. at 202. The Court concluded that the lot owners in the assessor's plat were on notice that the Summers reserved the easement for all the properties that they owned, not just the platted lots. *Id*. at 203-204.

It is evident from our Supreme Court's discussion of the record that the land encompassing the boat basin and community areas had been separated from the other lands owned by the Summers when the Summers began selling parcels outside the plat and purported to convey the easement over the boat basin with those sales. Moreover, the Court's discussion of the evidence showed that at least one lot was far removed from the boat basin. And yet, our Supreme Court held that the Summers had lawfully reserved the easement for all of their properties, even those outside the plat and without regard to whether the parcels subsequently sold had any connection to the easement. *Id*. at 201-202. Grandfield and Innes attempt to distinguish the decision in *Summers* by asserting that there must have been some connection between the parcels outside the plat and the area designated as the boat basin, but their attempt is unpersuasive. The Supreme Court plainly accepted that a grantor could reserve an easement for the benefit of his or her other properties even though those properties were not directly next to the servient estate.

Contrary to the contentions of Grandfield and Innes, this case also does not include facts similar to those in *Stockdale*, 220 Mich 444. In that case, the original grantor—Harrington— owned 101 acres of land. *Id*. at 445. He sold $81^2/_3$ acres to another and reserved a right-of-way across the $81^2/_3$ acres to access the remaining $19^1/_3$ acres so he could cut the timber. *Id*. Harrington then sold the $19^1/_3$ acres to W.A. Foote, but he reserved the right to cut the timber on the $19^1/_3$ acres. *Id*. at 445-446. Harrington then sold the right to cut the timber to another. *Id*. at 446. The owner of the $81^2/_3$ acres prevented the plaintiff from crossing his land to cut the timber. *Id*. at 446.

In examining the nature of the easement, our Supreme Court held that Harrington created an easement in gross because he specified that the right-of-way was for a "manifest purpose"—to cut timber—and was not appurtenant to the $19^1/_3$-acre parcel. *Id*. at 447. The Court cited with approval authorities that distinguished between an easement that was intended to benefit a particular tenement without regard to the ownership of the tenement and an easement granting the right to enter land to remove gravel or other materials. *Id*. at 447-448. The latter type of easement, the Court stated, was an easement in gross. *Id*. at 447-448.

The facts of *Stockdale* are not at all like the facts in this case. The Kings did not reserve a right-of-way to remove gravel, timber, or other materials from the land; they reserved a right-of-way as part of a plan of development. The historical development of that plan showed that the Kings had created a neighborhood centered on Murray Lake with access to the lake as a dominant

-10-

theme. They also made a second reservation that directly benefited other properties by providing access to those properties in the same conveyance that created the Lake Easement. Grandfield and Innes complain that there was no distinct dominant estate, but that is simply a restatement of the argument that the reservation in their chain of title did not identify a specific dominant estate. Nothing prevented the Kings from reserving an easement appurtenant to all of their remaining properties. See *Summers*, 351 Mich at 201-202; *Akers*, 300 Mich at 624. Moreover, the evidence that the Kings reserved a different easement over another property to allow the owner of Parcel C to gain access to Bedaki Avenue at a short distance from the start of the Lake Easement on the other side of Bedaki Avenue further demonstrated that the Kings intended the reservation to benefit, at the very least, Parcel C. In sum, unlike the case in *Stockdale*, the totality of the circumstances showed that the Kings reserved the Lake Easement to benefit their remaining properties, which did not have direct access to Murray Lake and had not yet been sold; as such, the reservation was appurtenant to—at the very least—Parcel C, because the Kings owned Parcel C in common with 3999 Bedaki Avenue when they reserved the easement, and both those parcels had been part of lands that the Kings had held in common.

Because the undisputed evidence showed that the Kings intended to reserve the Lake Easement to benefit the property or properties that they still owned, the trial court did not err when it determined that the Kings reserved the Lake Easement as an easement appurtenant to—at the very least—Parcel C. See *Smith*, 224 Mich at 382. Consequently, it did not err when it granted summary disposition in Byrne's favor on that issue. See *Barnard Mfg*, 285 Mich App at 369.

## III. SCOPE OF THE EASEMENT

### A. STANDARD OF REVIEW

In his appeal, Byrne argues that the trial court erred when it determined, as a matter of law, that Byrne could not park on the Lake Easement or erect a dock at the end of it. Whether a particular use by the owner of the dominant estate is reasonably necessary to his or her enjoyment of the easement is normally a question of fact. *Unverzagt v Miller*, 306 Mich 260, 266; 10 NW2d 849 (1943). The trial court resolved the present dispute as a matter of law on a motion for summary disposition. As such, there are no findings of fact to which this Court must defer. This Court reviews de novo a trial court's decision on a motion for summary disposition. *Barnard Mfg*, 285 Mich App at 369. This Court reviews the proper interpretation of a deed in the same way as a contractual agreement, *Wiggins*, 291 Mich App at 551, and this Court reviews de novo whether an agreement is ambiguous, *Klapp*, 468 Mich at 463. Finally, this Court reviews de novo whether the trial court properly interpreted and applied Michigan's common law. *Conlin*, 313 Mich App at 254.

### B. BACKGROUND LAW

The conveyance of an easement gives to the grantee all rights as are "incident or necessary to the reasonable and proper enjoyment of the easement." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 41-42; 700 NW2d 364 (2005) (quotation marks and citation omitted). Nevertheless, the use of an easement must be strictly confined to the purpose for which it was granted or reserved. *Id*. at 41. An easement holder may not improve the easement if the improvement is unnecessary to the use of the easement or if the improvement unreasonably

burdens the servient estate. *Id*. To determine the proper scope of the easement, courts must first examine the language of the grant or reservation. See *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003). If the language of the grant is plain and unambiguous, this Court will enforce the easement as written. *Id*.

As already discussed, the Kings reserved an easement for "roadway purposes" from Bedaki Avenue to "the waters edge of Murray Lake." As such, the question is whether the grant of an easement for "roadway purposes" over lakefront property to the water's edge of the lake includes the right to park along the "roadway" and the right to erect a dock at the end of the roadway.

## C. PARKING ON ROADWAY

More than 130 years ago, our Supreme Court considered whether a farmer who had been granted an easement for a private road under a statutory procedure for compelling such easements had the right to fence the roadway. See *Harvey v Crane*, 85 Mich 316, 318-321; 48 NW 582 (1891). In considering the scope of the easement, the Court first distinguished a grant of an easement for a private road from easements that were limited to a right-of-way or a right of ingress and egress. *Id*. The court first noted that caselaw had established that an easement for ingress and egress did not require fencing to facilitate the use of the easement; for that reason, the owner of the dominant estate could not install fences because that would increase the burden on the servient estate. *Id*. at 324. A private road, the Court stated by way of contrast, included the right to use the road for any purpose for which a highway may be used. *Id*. at 321-322.[1]

Because it included the right to use the road for any purpose for which a highway may be used, the Court concluded that the owner of the dominant estate had the right to fence the road under the circumstances because the fencing was necessary to promote the beneficial use of the roadway to drive cattle:

> Applying the rules laid down by these adjudications, it seems clear to me that plaintiff is entitled to make use of this way for any and all purposes for which a road may be used; . . . that plaintiff is entitled to do any act which may be necessary to promote its beneficial use, to the extent of inclosing the same; that the only limit to the servitude which she is entitled to impose upon the fee is what may be deemed necessary and essential to her enjoyment of the rights acquired; that the rights of defendant in this way are subject to plaintiff's necessities arising from the legitimate use of the road; that the necessity and reasonableness of the means made use of to adapt the road to her use are questions of fact, to be determined by the trial court; and that the findings of the trial court in that regard are conclusive upon us. The court below finds that the plaintiff has been accustomed daily to drive her cattle

---

[1] This Court has also recognized that the owner of an easement for a roadway may pave or grade the roadway if necessary to the use and enjoyment of the road. See also *Carlton v Warner*, 46 Mich App 60, 61-62; 207 NW2d 465 (1973). Plaintiff has not challenged on appeal the trial court's determination that the Lake Easement may not be paved.

and horses through this private road, and that a fence along the same is an incident necessary to the reasonable enjoyment thereof. [*Id*. at 325.]

Our Supreme Court has continued to recognize that, for a public easement for roadway purposes, the easement includes the right to use the roadway for all appropriate purposes to which roads and streets are normally devoted. See *Blackhawk*, 473 Mich at 49. It is a matter of common experience that, when the easement includes sufficient width to allow parking, persons generally use streets and roads for temporary parking while visiting a location next to the roadway. For that reason, a grantor's decision to create an easement for a roadway would intuitively appear to include the right to use the roadway for all the uses which roadways are typically used, including on-street parking. Nevertheless, there do not appear to be any Michigan authorities directly discussing the right to park along an easement dedicated for roadway purposes, as opposed to an easement for ingress and egress alone. Cf. *Crew's Die Casting Corp v Davidow*, 369 Mich 541, 546-547; 120 NW2d 238 (1963) (stating that an easement limited to ingress and egress conveys the right of passage alone, which does not include the right to park).

The trial court relied on the decision in *Murphy Chair Co v American Radiator Co*, 172 Mich 14; 137 NW 791 (1912), to conclude that parking is not permitting on a roadway. In *Murphy Chair*, the Supreme Court discussed the rights of the parties who were each granted overlapping easements: the chair company had a right-of-way to its property, and American Radiator had an overlapping easement for a railroad track to its property. *Id*. at 16-17. The Court concluded that the grant of a right-of-way was earlier and superior to the grant of the railroad easement. *Id*. at 27-28. The Court further determined that the railroad should not be permitted to park railroad cars in such a way as to block the right-of-way to Murphy Chair, and Murphy Chair should not park vehicles so as to obstruct the railroad. *Id*. at 30-31. The Court did not state a general rule as to whether the easements included a right to temporarily park or whether such parking would invariably exceed the scope of the easement; instead, the Court merely stated that the parties should exercise their rights reasonably. *Id*. Consequently, the decision does not provide much guidance.

In those foreign jurisdictions to have considered the distinction between an easement for a roadway and one for ingress and egress, the courts have held that an easement for a roadway includes the right to park along the roadway so long as the parking does not unreasonably interfere with the rights of the owner of the servient estate. See, e.g., *Seymour v Harris Trust & Savings Bank of Chicago*, 264 Ill App 3d 583, 600; 636 NE2d 985 (1994) (agreeing that an easement for ingress and egress does not include the right to park, but stating that the easement was for a roadway, which does include the right to park if parking does not unreasonably interfere with the right of the holder of the servient estate); *Heath v Kettenhofen*, 236 Cal App 2d 197, 204; 45 Cal Rptr 778 (1965) (allowing transitory parking on an easement for a roadway). That right is in contrast to the rights conveyed with an easement for ingress and egress or a mere right-of-way. See *Maasen v Shaw*, 133 SW3d 514, 519-520 (2004) (Mo App, 2004) (stating that only the servient

estate holder has the right to park in an easement for ingress and egress and then only to the extent that the parking does not interfere with the dominant estate's rights).[2]

Given our Supreme Court's guidance, we conclude that an easement for a roadway includes broader rights than an easement limited to ingress and egress. See *Blackhawk*, 473 Mich at 49; *Harvey*, 85 Mich at 325; and *Seymour*, 264 Ill App 3d at 600. We hold that a grant of an easement for roadway purposes necessarily includes the right to temporarily park within the roadway to the extent that the actual exercise of that right does not interfere with the rights of the servient estate. For that reason, the trial court erred to the extent that it determined that Byrne could *never* use the roadway easement to park vehicles temporarily under any circumstances as a matter of law. Because there was no evidence that Byrne had been exercising his right to park on the easement in a way that interfered with the rights of Grandfield and Innes, and because the nature of the easement did not preclude parking as a matter of law, the trial court should have granted summary disposition in favor of Byrne and rejected the request to restrict Byrne's right to park before there was any factual basis for imposing such a restriction. See *Barnard Mfg*, 285 Mich App at 369. On remand, it is within the discretion of the trial court to determine what constitutes proper short-term or temporary parking.

## D. ERECTING A DOCK

The trial court also erred when it concluded that, as a matter of law, Byrne had no right to construct a dock at the end of the roadway easement.

The right to erect and maintain a dock on a lake is a riparian right. *Dyball v Lennox*, 260 Mich App 698, 705; 680 NW2d 522 (2004).[3] Although riparian rights cannot be severed from riparian lands, the owner of riparian lands can grant an easement to allow the owners of lands that are not riparian to enjoy rights that are traditionally associated with riparian ownership. *Id*. at 706. Whether the grantor intended to convey riparian rights through an easement depends on the language used in the creation of the easement. *Id*. at 703-704, 708-709.

It is well settled that, when a grantor grants or reserves an easement to a river or lake that includes language allowing the owner of the dominant estate to access the river or lake, that grant does not include the full panoply of riparian rights. See *Thompson v Enz*, 379 Mich 667, 685; 154 NW2d 473 (1967) (stating that a reservation of a right-of-way for access to water does not convey full riparian rights). Rather, by limiting the easement to access the water, the grantor has authorized the owner of the dominant estate to use the servient estate solely to gain access to the water for swimming, fishing, bathing, wading, and boating. It does not include any additional riparian rights, such as sunbathing on the easement, or erecting structures like a dock. See *Delaney v Pond*, 350 Mich 685, 686-688; 86 NW2d 816 (1957) (examining the scope of an easement granting the right to "access . . . the river and shores of Loon Lake"). This is so because any person

---

[2] Although decisions from foreign jurisdictions are not binding on this Court, they may be persuasive. See *Franks v Franks*, 330 Mich App 69, 97 n 4; 944 NW2d 388 (2019).

[3] This Court by convention uses riparian to refer to both riparian and littoral rights. *Dyball*, 260 Mich App at 705 n 2.

who gains lawful access to a navigable body of water has the right to make use of the water, but only a riparian owner may make use of those rights—such as building a dock—that are held exclusively by riparian owners. *Thies v Howland*, 424 Mich 282, 288; 380 NW2d 463 (1985). The grant of an easement that allows for access to water does not convey more than the right to make use of the rights common to all persons who gain lawful access to the water. *Id*. at 294-295; see also *Dyball*, 260 Mich App at 708 ("The terms ingress and egress to the water's edge do not show an intent to grant a right to construct and maintain a dock, a right typically reserved to riparian owners.").[4]

Grandfield and Innes rely heavily on authorities that restate the law applicable to easements in which the grantor limited the easement to access a river or lake or otherwise limited the easement to purposes of ingress and egress. The case at hand does not, however, involve an easement that can fairly be interpreted as limiting the owner of the dominant estate to using the easement for mere access or ingress and egress to Murray Lake. The Kings reserved a 30-foot-wide easement for "roadway purposes." The plain language of the easement includes the right to construct a road from Bedaki Avenue to Murray Lake. The use of the term "roadway" also suggests rights greater than that which would accompany a reservation for a path, driveway, or right-of-way. The evidence further showed that the companion easement across the northeastern portion of 3999 Bedaki Avenue had been improved consistent with a grant for a roadway. Moreover, although Bedaki Avenue was wider than 30 feet, the King's decision to reserve a wide swath of land for the easement indicates that they intended the easement to be a significant roadway. The undisputed evidence and language of the reservation showed that the Kings intended to reserve an easement that included all uses that were typical for roadways. For that reason, Grandfield and Innes cannot rely on the authorities interpreting easements for ingress and egress or limited to accessing water to establish the scope of the King's reservation. Rather, the governing law is the law applicable when a grantor grants or reserves an easement over land for a road or street, which ends at a body of water.

Writing for our Supreme Court in 1892, Justice COOLEY stated that, under Michigan law, if a strip of land that constituted a street, which extended to a river, had been granted to a private person, that person would undoubtedly have the right to erect a wharf on the street end. *Backus v Detroit*, 49 Mich 110, 115; 13 NW 380 (1882). Justice COOLEY noted that the street at issue in the case before the Court had been dedicated to the city, not a private person, so the city held the land in trust for street purposes. *Id*. He stated that it was of no importance that the statute governing such grants referred to the fee as opposed to an easement. *Id*. He concluded that the weight of the authority demonstrated that a gift of a street to a municipality included the right to erect a wharf at the end of a street to give access "from the highway by land to the highway by water." *Id*. at 120; see also *McCardel v Smolen*, 404 Mich 89, 99-101; 273 NW2d 3 (1978) (recognizing that the dedication of a road that terminates in a lake may include certain riparian rights, as stated in *Backus*).

---

[4] However, our Supreme Court has stated that an easement for ingress and egress to launch boats includes the right to make improvements necessary to launch boats. See *Maniaci v Diroff*, 505 Mich 1, 3-4; 940 NW2d 55 (2019).

Nearly a hundred years after the decision in *Backus*, our Supreme Court reiterated that public ways that end in navigable bodies of water include the right to build wharves at the end of the street. *Thies*, 424 Mich at 295-296. The Court further held that the right did not depend on the ownership of the underlying fee because the grant of a street creates a presumption that the grantor intended to include the right to build structures to aid in access to the water. *Id*. at 296. The Court also did not agree that such a grant must be made to the general public. *Id*. Rather, the Court accepted that the nature of the grant would remain the same when applied to a limited subset of users. *Id*. Accordingly, a conveyance with a reservation of an easement for a roadway that terminates in a lake presumptively includes the right to erect a dock to facilitate use of the highway by land to access the highway by water. *Id*.

The Kings reserved an easement for roadway purposes over a strip of land that extended from Bedaki Avenue to Murray Lake. The Kings did not include any language limiting the roadway to ingress and egress, or otherwise describing the roadway as being limited to accessing the waters of Murray Lake. Absent such language, the reservation presumptively included the right to erect a dock consistent with the law of dedications involving roadways that terminate in a navigable body of water. Therefore, the trial court erred when it determined that such an easement did not include the right to erect a dock as a matter of law. See *Thies*, 424 Mich at 295-296; *McCardel*, 404 Mich at 99-101; *Backus*, 49 Mich at 115. Additionally, because there was no evidence that Byrne had in fact erected a dock, no evidence that he planned to erect a dock in the near future, and no evidence concerning the size and nature of any dock that he might erect, there was no evidence to support a decree limiting Byrne's rights on a motion for summary disposition. The trial court erred when it limited Byrne's right to use the easement without a showing that his actual use had exceeded the scope of the easement or otherwise unduly burdened the servient estate. See *Barnard Mfg*, 285 Mich App at 369.

## IV. CONCLUSION

The trial court did not err when it determined that the Kings reserved the Lake Easement as an easement appurtenant to Parcel C. Accordingly, we affirm the trial court's order of July 21, 2020. The trial court, however, erred to the extent that it determined that an easement for roadway purposes could not include limited, temporary parking as a matter of law, and erred when it determined that, as a matter of law, such an easement did not include the right to erect a dock at the end of the roadway. The trial court should not have limited Byrne's rights in those ways on the basis of a motion for summary disposition. Rather, whether and to what extent a particular use or improvement improperly burdens the servient estate must depend on the facts attending the use or improvement when the use or improvement occurs. Consequently, we reverse the trial court's decision and vacate its order of February 11, 2021, to the extent that the trial court barred Byrne from temporarily parking along the Lake Easement or erecting a dock as a matter of law. We remand this case to the trial court to amend the order consistent with this opinion.

Affirmed in part, reversed in part, vacated in part, and remanded for amendment of the order. We do not retain jurisdiction. As the prevailing party, Byrne may tax his costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Kathleen Jansen
/s/ Christopher M. Murray